TUPELO GARMENT CO. OF TUPELO, MISS., *v.* STATE TAX COMMISSION.

(Division A. April 19, 1937.)

[173 So. 656. No. 32699.]

F. G. Thomas, of Tupelo, for appellant.

**J. A. Lauderdale,** Assistant Attorney-General, for appellee.

**McGowen, J.,** delivered the opinion of the court.

Appellant, the Tupelo Garment Company, engaged in the business of manufacturing shirts, filed with the State Tax Commission its income tax report for its fiscal year beginning July 1, 1933, and ending June 30, 1934, as provided by chapter 120, Laws of 1934. In this report it deducted the sum of $25,000 paid by it to a foundation or trust fund, and the sum of $29,970.10, claimed by it as a loss sustained on the sale of certain buildings and land. After these deductions were made the appellant reported and paid on a net income of $107,577.96. The State Tax Commissioner declined to allow the deductions above mentioned, and assessed additional taxes thereon in the sum of $3,296.82. The appellant then prosecuted an appeal to the full commission, as provided by law. The commission concurred in the findings made by the commissioner and approved the additional assessment, whereupon the garment company filed its petition in the chancery court of Hinds county, with a bond as provided by law. The case was tried on that petition, answer thereto denying that the appellant was entitled to the deductions, and an agreed statement of facts. The chancery court declined to allow either deduction; approved and confirmed the assessment made by the State Tax Commission, and rendered a decree against the Tupelo Garment Company, and its surety, for the tax and interest, amounting to $3,746.28. From that decree the Tupelo Garment Company prosecutes an appeal here.

Chapter 120, Laws of 1934, is known as the Income

Tax Act. Section 3 of said chapter levies a tax "upon the entire net income of every resident individual, corporation, association, trust or estate, in excess of the credits provided." Section 6 defines "net income" as the gross income, as defined thereunder, less the deductions allowed. Section 7 defines the term "gross income" and provides that certain enumerated items shall be exempt from taxation. The deductions allowed are as follows:

"Sec. 8. In computing the net income there shall be allowed as deductions:

"(1) All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. . . .

"(4) Losses sustained during the taxable year not compensated for by insurance or otherwise, if incurred in trade or business. Losses sustained from the disposition of capital assets employed in the conduct of the regular trade or business shall be determined by deducting from the cost (or value as of March 16, 1912, if acquired prior to that date) the depreciation sustained and the amount realized therefrom."

Section 36 of the act provides that: "The rules and regulations issued by the treasury department of the United States government relative to the interpretation of the federal income tax statute of 1921 shall, in so far as applicable, be used in the construction of this statute."

The Tupelo Garment Company, hereafter called the Garment Company, had outstanding shares of stock of the value of $193,507 for the fiscal year here involved. The net income thereof was $162,505.06, including the contested deductions. In that year it made a little more than 83 per cent. of its entire outstanding capital. The Garment Company had a board of directors consisting of seven members, four of whom were R. F. Reed, W. B. Fields, J. P. Hunter, and R. W. Reed. These four men, together with two others, formed a partnership

known as the Tupelo Realty Company in the latter part of June, 1934, and a few days later the partnership was incorporated under the same name. The stockholders of this corporation were the same as the partners in the partnership. The Tupelo Realty Company issued $2,200 worth of stock, and 99 per cent. of it was owned by four stockholders—the four above-named directors of the Garment Company.

At a meeting of the directors of the Garment Company on June 19, 1934, the four directors above named, who constituted a majority of the board, resolved to sell the buildings and to create a foundation fund, and called a special meeting of the stockholders for June 26, 1934. In 1934 the Tupelo Garment Company completed its factory building which was used then and now in manufacturing its products. The building cost $54,-712.20, against this depreciation in the sum of $1,765.10 was charged, leaving a net cost, or value, of $52,947.10. At the special meeting of the stockholders R. F. Reed reported for the directors that they had received an offer of $23,000 cash for a sale of the buildings and improvements, real estate and lease contracts covering the company plant in Tupelo. The stockholders authorized the directors to accept the proposition and to negotiate for the lease of such property from the purchaser. At the same meeting the stockholders also authorized the establishment of the foundation or trust fund, a copy of which was before them, and the payment of $25,000 thereto.

Before June 30th the directors sold the buildings as authorized, and executed the trust and paid $25,000 to the trustees thereof as directed. At the regular meeting of the stockholders on July 10, 1934, the board affirmed and approved both transactions. The sale of the real estate, buildings, and improvements, occasioned a loss of more than $29,000. The deed to the partnership, Tupelo Realty Company, is in regular form, as is also the deed from the partnership to the corporation, Tupelo

Realty Company, and so far as this record discloses the Tupelo Garment Company was entirely stripped and divested of the title to the property under consideration.

It is shown in the agreed statement of facts that the Tupelo Garment Company operated plants at Tupelo, New Albany, Booneville, Baldwyn, and Fulton in this state, and it appears to have been its policy not to own real estate, because at the other points mentioned it did not own any real estate but leased buildings for its purposes.

The Garment Company immediately leased from the Tupelo Realty Company the buildings and real estate, formerly owned by it, for a rental of $500 a month or $6,000 a year, and this lease has been continued. At the meetings of the stockholders and directors the four directors above mentioned controlled in shares of stock and proxies a majority of the votes; they also owned 99 per cent. of the stock of the realty corporation which received the deed to the real estate here in question. For the year 1934 the real estate and buildings involved were assessed for taxes in the city of Tupelo and in the county at a value of $3,500, and thereafter the Tupelo Realty Company was assessed on the same property at a valuation of $7,500.

1. After the entire sale had been completed, the stockholders again ratified and approved this immense loss on a practically new building, so that, there is no possible theory upon which this court can hold that the stockholders were defrauded. The stockholders of the Garment Company had the right to decide that it was not good business policy for it to own buildings; they may have considered that probably no other corporation in the city of Tupelo would desire to lease the buildings in controversy. The record does not disclose what depreciation the use of the building would cause, nor what the cost of its maintenance, including taxes and insurance, would be in the future. The record shows that the purchase price, $23,000, was paid by the Tupelo

Realty Company; that it secured the money from a bank in Tupelo, and within a month borrowed $22,000 of the $25,000 set aside by the Garment Company for the foundation or trust fund. We do not think the fact that the four directors bought the building can militate against the sale and the effectual vesting of the title. The Garment Company divested itself thereof entirely. The fact that the Garment Company sold the buildings to its directors, under these circumstances, does not in law destroy or avoid the sale.

We are reluctantly compelled to hold under section 8, subdivision (4) of chapter 120, Laws of 1934, that the loss of $29,970.10 was one sustained from the disposition of capital assets employed in the conduct of the regular business of said company. It is not unusual that individuals decide to sell property at a loss as a business policy rather than continue ownership thereof. The fact that in this case the Garment Company voluntarily suffered this immense loss does not alter the fact of the loss; it only arouses suspicion. If we undertook to view the sale here as a gift of more than $29,000 to the Tupelo Realty Company we would be foreclosed, because the reported and recited purchase price of $23,000 is a substantial sum, and such a conclusion might lead to the taxation of all large or substantial losses, which the statute does not seek to accomplish.

2. The court below disallowed the claimed deduction of $25,000, which was paid over by the Garment Company to a foundation fund. The claim for this deduction is based on subdivision (1) of section 8 of the act, which allows ''all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.''

The instrument creating the trust or foundation, too lengthy to set forth herein, set aside $25,000 for the purpose of enabling the trustees named therein to make loans to the company's employees for meeting emergencies arising, and unforeseen events, requiring and

demanding financial aid, etc. The preamble, in almost eloquent language, recited that the company's success would depend upon the happiness of its employees; that the instrument was created in order to stimulate the esprit de corps of the employees, and that its purpose was to create amity, good feeling, co-operation and good will between the company and its employees. The instrument provided for five trustees to be elected annually by the board of directors of the Garment Company, three of whom had to be directors of the Garment Company, one an employee thereof, and one a disinterested person. The title to the funds turned over to the trustees was absolutely vested in them, subject to the conditions and limitations contained in the instrument. The trustees were authorized to invest the funds with the view of deriving the best possible income, considering the safety of such investments; they were the sole judges of the character, amount, and security of such investment. Section 18 of the instrument is as follows: "Out of any amount of the principal of the fund the Trustees may cause to be made loans and advances, to the employees of the Trustor in good standing, and primary consideration shall be given to such loans and advances, and to charge for such loans or advances such interest or interest rates as they may deem best and proper not repugnant to law, such loans to be secured as amply as possible considering the situation and need of the borrower and the emergency arising requiring such a loan or advance. The Trustees may make such loans or advances to the Trustor's employees upon open note or evidence of debt, without security upon obtaining the signature as co-maker or endorser of at least two other of such employees in good standing, which would reasonably assure repayment thereof."

The trustees were required to use the income arising from their investments to keep the corpus of the estate unimpaired and to pay the necessary expenses of administering the fund, and from any remaining income they

were authorized to take care of the needs of indigent employees, to render financial aid and assistance to employees in good standing. They were also empowered to enlarge and increase the fund. The board of directors of the trustor was authorized to remove any trustee who did not conform to the judgment of the majority. There is an expression of hope that the funds of the foundation might be converted into an employees pension fund or an employees relief fund, and in the event such could be done, the trustees were authorized to so change it.

Section 27 of the instrument is as follows: "This trust may be terminated at any time by action taken by the Board of Directors of the Trustor, and upon notice given to the Trustees, they shall surrender and turn over to the Trustor all funds, property and assets of every kind and character, owned and held in any way connected with or related with this trust, and shall execute any and all instruments, documents and papers necessary to effectually make such transfer."

Section 28 authorized the board of directors of the trustor to alter, amend, change, or repeal any of the terms and conditions, rules and regulations and provisions of the trust, or add new and additional or amended terms and conditions thereto.

In the agreed statement of facts it is shown that many employees had availed themselves of the opportunity to borrow from this fund, and many loans had been made, ranging in amount from a few dollars up to as much as $250, and that the creation of the foundation had increased the loyalty and amity of the employees.

The creation of this foundation and the setting aside of the fund occurred within one week of the time when the Garment Company had to account to the state for its income. As above stated, only a few days after the foundation was created the trustees loaned $22,000 to the Tupelo Realty Company.

The record discloses that after the payment of expenses and all deductions, save those two involved in

this case, the garment company made a net income for that fiscal year in excess of 25 per cent. of the amount of wages paid the employees. There is no evidence tending to show that other employers of labor in this state have created similar foundations, nor can we say that such an expenditure has become "usual and ordinary" in this state. However, section 36 of the income tax act provides that the rules and regulations adopted in the enforcement of the federal income tax statute of 1921 shall, in so far as applicable, be used in the construction of the statute.

The United States Board of Tax Appeals has held that foundations or trusts established by employers for pensions or hospitalization of employees are usual and ordinary expenses when created in good faith, and has allowed deductions therefor. Sugarland Industries v. Commissioner, 15 B. T. A. 1265; Elgin National Watch Co. v. Commissioner, 17 B. T. A. 339; Hibbard, Spencer, Bartlett & Co. v. Commissioner, 5 B. T. A. 464, and Forbes Lithograph Manufacturing Co. v. White (D. C.), 42 F. (2d) 287. Therefore, we would be reluctant to say as a matter of law that such an appropriation, made in good faith for the establishment of a foundation for the benefit of the employees, would not be "usual and ordinary expense." Neither would we be willing to say that this court would discourage the initiation of a plan similar to the one here involved, because it is apparent that such recognition of the employees by such a trust would tend to enhance the value of their services by creating in them a spirit of gratitude and amity toward the employer. If it be true that this is the first corporation in this state to follow the course of recognizing employees as human beings, and at the same time increasing the value of the man power employed by it through more efficient service, we do not think this fact alone should stay the court from approving this deduction on the ground that the expenditure is not "usual and ordinary." However, granting that such a trust

could be created, and granting that this trust, in so far as its stipulations and purposes are concerned, contains all the elements requisite to establish a trust, and conceding that the employees of this Garment Company would be cestui que trusts, still we are of the opinion that the deduction in this case cannot be allowed. . We must consider that the Garment Company created the fund just a few days before it was bound to account to the State Tax Commission for its income, and that at the same time it had made a sale of its real estate at a considerable loss. We must also consider the fact that the Garment Company reserved the right to terminate the trust at any time its board of directors saw fit, without regard to the cestui que trusts, the increased necessity for the maintenance thereof, any conditions that might exist, the success of carrying out the objects of the trust, and without the consent of the trustees of the foundation. The mere fact that a trust may be terminated by the trustor is not controlling, but all the facts which we have set forth convince us that the entire record does not clearly show that this deduction should be allowed.

In many of the cases we have examined similar to the one here involved, it has been provided that a trust may be terminated by the agreement of the trustees named in the trust and the trustor. Forbes Lithograph Manf. Co. v. White, supra; Elgin National Watch Co. v. Commissioner, supra, and Hibbard, Spencer, Bartlett & Co. v. Com'r, supra. We take into consideration the fact that this trust could be operated two ways, one for the benefit of the cestui que trusts, and the other for the benefit of the trustor by relieving itself of the tax on the corpus of the trust. Lending money to those people over whom it had a very close supervision and requiring good security indicates to us clearly that in spite of the eloquent language ostensibly creating a permanent valid trust, the trustor had an eye to investment for its own benefit rather for the benefit of its employees; and

this seems to be true because the trustor had the reserved power to terminate the trust at any time.

In order to allow this deduction we would have to say that the right thereto clearly appears, for such a deduction is in fact an exemption, and exemptions must be strictly construed against the exemptionist. Jackson Fertilizer Co.. v. Stone, 173 Miss. 183, 162 So. 170. We are of the opinion that the idea of an investment was predominant by the terms of the trust.

The claim for the loss in the sale of the buildings and grounds is allowed as a proper deduction. The claim for the establishment of the foundation is disallowed, and the case is remanded to the lower court for a decree to be entered in accordance with the views herein set forth.

Affirmed in part; reversed in part and remanded.

CONCURRING OPINION.

**Smith, C. J.,** delivered an opinion specially concurring.

I concur in the disallowance of the exemption claimed on the $25,000 placed by the appellant in the trust fund, set forth in the main opinion; but solely on the ground that the trust was revocable at the appellant's pleasure, resulting in its having the power, if it desired, to revoke the trust immediately, thereby reacquiring the $25,000 and any accretions earned therefrom by the trustees. Had the trust been irrevocable, I am not prepared to say that the exemption claimed because of its creation should not be allowed.